UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

————————————————————————————
                                    )
CHRISTOPHER MACE o/b/o A.M.,         )
                                    )
                Plaintiff,           )
                                    )       CIVIL ACTION
        v.                           )       NO. 12-1357-WGY
                                    )
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,     )
                                    )
                Defendant.[1]        )
                                    )
————————————————————————————

YOUNG, D.J.[2]                              February 19, 2015

MEMORANDUM AND ORDER

## I.  INTRODUCTION

Christopher Mace ("Mace") brings this action pursuant to 42
U.S.C. § 405(g) on behalf of A.M.,[3] his minor son, seeking
judicial review of the final decision of the Commissioner of
Social Security ("Commissioner") denying Supplemental Security
Income ("SSI") benefits to A.M. on the basis that he was not
disabled.  Mace requests that this Court reverse the

_____

[1]  The Commissioner of Social Security was the original
named defendant.  On February 14, 2013, Carolyn W. Colvin took
office as Acting Social Security Commissioner.  She has
therefore been substituted as the named defendant in this matter
pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2]  Of the District of Massachusetts, sitting by designation.
Reassignment Order, ECF No. 13.

[3]  The name of the minor has been abbreviated to his
initials under Rule 5.2 of the Federal Rules of Civil Procedure.

1

Commissioner's decision and remand for immediate calculation of benefits.  The Commissioner has filed a motion for judgment on the pleadings and requests that the decision be affirmed.

**A.  Procedural History**

Mace filed an application for SSI on behalf of A.M. on April 9, 2008, with an alleged disability onset date of February 1, 2004.  Soc. Sec. Admin. R./Tr. ("Admin. R.") 125-28, ECF No. 9.[4]  The application was denied on September 9, 2008, and Mace filed a timely request for a hearing.  Id. at 62-66. Accompanied by counsel, Mace and A.M. appeared and testified at the hearing on October 14, 2010.  Id. at 40-60.  On December 3, 2010, an Administrative Law Judge (the "hearing officer") issued an unfavorable decision finding that A.M. was not disabled within the meaning of 20 C.F.R. 415.924(a).  Id. at 11-34.  Mace timely requested review by the Appeals Council, which denied his appeal on July 19, 2012.  Id. at 1-8.  On September 5, 2012, Mace filed a claim in this Court against the Commissioner seeking reversal of the Commissioner's decision denying A.M.'s claim for benefits.  Compl., ECF No. 1.  The Commissioner answered on January 2, 2013.  Def.'s Answer, ECF No. 8.  On February 19, 2013, Mace filed a brief in support of his action

---

[4] The administrative record was provided under seal to this Court in eight parts.  For ease and clarity of presentation, this opinion will simply refer to the page numbers of the record without reference to the specific docket number of that portion of the record.

2

seeking reversal of the Commissioner's denial of benefits. Pl.'s Br., ECF No. 11.[5]  The Commissioner filed a brief in response on April 1, 2013.  Br. Supp. Comm'r's Mot. J. Pleadings ("Def.'s Br."), ECF No. 12.

**B.  Factual Background**

A.M. was born on September 22, 1998, meaning he was ten years old when Mace filed his claim in 2008 and twelve years old at the time the hearing officer issued her decision in 2010. Admin. R. 17.  Thus, as contemplated by the functional equivalence categories laid out in 20 C.F.R. § 416.926a(g)(2), he was a school-age child in 2008 and an adolescent in 2010.

**1.  Educational Records**

**a.  Behavior Rating Scale Report by Dr. Clark: September 2005**

When A.M. was about seven years of age, Mace began to grow very concerned about his behavior at home and sought a behavior report.  Admin. R. 141.  Dr. Leslie S. Clark ("Dr. Clark"), the school psychologist, interviewed Mace, who explained the various difficulties he was facing with A.M. at home.  Id.  Mace stated that A.M. was constantly lying, that he suffered from

---

[5] Pursuant to the Northern District of New York's General Order 18 governing appeals from decisions of the Social Security Administration, these memoranda of law are treated as though "both parties had accompanied their briefs with a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure."  Notice/General Order 3, ECF No. 3.

inappropriate urination, and that he had angry outbursts and difficulty sleeping.  Id.  Dr. Clark spoke to A.M.'s kindergarten teacher, Mrs. Gillan, who said that he had a desire to do well and could be successful when he understood what he had to do.  Id. at 141-42.  Despite this, she said that he exhibited negative behavior within the classroom and needed motivation and support to complete his work.  Id. at 142. A.M.'s first grade teacher, Mrs. Massia, noted that he was a strong speller, but was easily distracted and had difficulty completing work.  Id.  After reviewing behavior rating reports completed by Mace and Mrs. Massia, Dr. Clark concluded that A.M. exhibited the profile of a child with attention deficit hyperactivity disorder, combined type ("ADHD").  Id. at 144. She also noted that his inappropriate urination, emotional outbursts, and difficulty sleeping were areas of concern.  Id. Dr. Clark suggested that A.M. continue with small group instruction and continued counseling support both inside and outside school.  Id.  She suggested that Mace consider whether medical intervention was required.  Id.

### b.  Individualized Education Plan (IEP): 2007-2008 Academic Year

In June 2007, A.M. received his first Individualized Education Plan ("IEP"), which listed his disability as "Other Health Impairment."  Id. at 129.  He was provided with testing

accommodations such as extended time and a quiet location to complete tests, permission to read aloud to himself, and permission to have his tests (except reading comprehension) read aloud to him.  Id. at 130.  He was also provided with assistance from a special education teacher for two daily sessions, each of which was thirty minutes in duration.  Id. at 129.

### c.    IEP: 2008-2009 Academic Year

Another IEP was put in place for the 2008-2009 academic year.  Id. at 169.  A.M.'s special education teacher assistance was increased to three forty-two-minute sessions every day.  Id. Regarding testing accommodations, the IEP provided for A.M. to take tests in a quiet location with few distractions.  Id. at 170.

### d.    Ms. Proulx Questionnaire: May 2008

Ms. Proulx, A.M.'s special education teacher, filled out a teacher questionnaire regarding his functioning in May 2008. Id. at 174-81.  Ms. Proulx saw A.M. three times a day (in a group of five other students) for reading, writing, and math assistance.  See id. at 174.  She found him to have serious problems in reading and comprehension, in expressing ideas in written form, and in applying problem-solving skills in class discussion.  Id. at 175.  With respect to attending and completing tasks, Ms. Proulx found him to have "obvious" problems in organizing his own things or school materials.  Id.

She noted that he had no problems in interacting and relating with others.  Id. at 177.  Ms. Proulx further noted that A.M. had "slight" problems in moving about and manipulating objects, particularly with regard to fine motor skills such as handwriting, cutting, and gluing.  Id. at 178.  She found that he had no problems in taking care of himself and that he regularly took his ADHD medication.  Id. at 179-80.

### e.    IEP: 2009-2010 Academic Year

Pursuant to his IEP for the 2009-2010 academic year, A.M. was provided with one forty-two-minute session with a consultant teacher and two forty-two-minute sessions in the resource room every day, along with two thirty-minute occupational therapy sessions each week.  Id. at 234-35.  He continued to receive testing accommodations including a quiet room and having directions explained to him.  Id. at 235.  He was provided with continued support in reading comprehension, writing, and math in a small group setting.  Id. at 236.  It was also noted that he continued to have trouble with motor tasks and that his hands shook while carrying his lunch tray.  Id.

### f.    IEP: 2010-2011 Academic Year

In the 2010-2011 academic year, A.M.'s IEP was modified to contain two daily forty-two-minute sessions with a consultant teacher for science and social studies, and three daily forty-two-minute sessions for reading, writing, and math with a

6

special class group in a 12:1:1 setting.  Id. at 248.  A.M.
continued to receive testing accommodations as in the previous
IEP.  See id. at 249.  He still had trouble and increased
anxiety with fine motor tasks.  Id. at 250.

### g.  Ms. Metcalf Questionnaire: October 2010

Ms. Metcalf, A.M.'s consultant teacher, filled out a
teacher questionnaire in October 2010.  Id. at 255-62.  At that
time, Ms. Metcalf was with him for six periods per school day,
and had known him for about four weeks.  Id. at 255.  With
regard to acquiring and using information, she found him to have
an "obvious" problem in comprehending and doing math problems.
Id. at 256.  In the domain of "attending and completing tasks,"
she found him to have an "obvious problem" in changing from one
activity to another without being disruptive, in completing work
accurately without careless mistakes, in working without
distracting himself or others, and in finishing work at a
reasonable pace.  Id. at 257.  With regard to "moving about and
manipulating objects," she found him to have an "obvious"
problem with dexterity and with moving and manipulating things.
Id. at 259.

### h.  IEP: 2011-2012 Academic Year

In 2011, A.M. received three daily sessions with a
consultant teacher in his regular classrooms, two daily sessions
in a special class with a 12:1:1 teacher ratio, and one daily

session in a resource room.  Id. at 379.  He was also permitted
the use of a calculator and word processor in addition to his
previous accommodations.  Id.  Additionally, he was exempted
from the school's requirement that students study a language
other than English.  Id. at 381.

### 2.   Medical Records

#### a.   Consultations with Dr. Schuessler

In February 2004, A.M. was brought to the pediatric clinic
at the Cerebral Palsy Association of the North Country for a
consultation with Dr. Donald Schuessler ("Dr. Schuessler").  Id.
at 305-06.  He was diagnosed with oppositional defiant disorder
("ODD"), and Dr. Schuessler recommended a behavior modification
approach which emphasized consistency.  Id.

A.M.'s next visit was in September 2005, at which time Mace
explained that A.M. exhibited vulgar, inappropriate, violent,
and disrespectful behavior at home.  Id. at 303.  Dr. Schuessler
noted that he appeared to have ADHD and sleep problems in
addition to his ODD.  Id. at 304.  Dr. Schuessler prescribed 0.1
mg of Clonidine and 10 mg of Ritalin, and he strongly
recommended that Mace engage in a vigorous behavior modification
approach.  Id.

During A.M.'s third visit in March 2006, Dr. Schuessler
found marginal progress in his sleep problems and apparent
improvement with regard to his ADHD and ODD issues.  Id. at 302.

He increased A.M.'s Clonidine prescription to 0.2 mg and continued his Ritalin.  Id.  In June 2006, Dr. Schuessler found that A.M. was doing well with regard to his sleep problems and ADHD issues and that his ODD issues had improved.  Id. at 300. Dr. Schuessler did not change A.M.'s medication at that time. Id.

In January 2007, Dr. Schuessler continued A.M.'s Ritalin medication and increased his dosage of Clonidine to 0.2 mg at bedtime.  Id. at 299.  At that time, neither Mace nor A.M. reported any difficulties at school.  Id.  At some point between then and August 2007, A.M.'s dose of Clonidine was increased to 0.4 mg per night and his Ritalin was increased to 20 mg.  See id. at 298.  Despite this, he continued to have trouble sleeping.  Id.  In August 2007, his Clonidine dose was reduced to 0.3 mg, and he was permitted to have a bedtime dose of Ritalin if it would be helpful.  Id.  In November 2007, Dr. Schuessler reduced A.M.'s Clonidine to 0.2 mg and discontinued his evening dose of Ritalin.  Id. at 296.  At this point, A.M. was reported to be doing quite well in school and handling himself well in that setting.  Id.  Mace did report, however, that A.M. would sometimes get a bit wild later in the afternoon and early evening.  Id.

In March 2008, Mace reported that A.M. was involved in oppositional behavior at school and had behavioral difficulties

at home.  Id. at 307.  Dr. Schuessler did not change A.M.'s
medication at this time, although he did recommend vigorous
behavior modification.  Id.

In December 2009, A.M.'s behavior at school was reasonably
appropriate, although he had some difficulties at home.  Id. at
346.  He was taking 27 mg of Concerta and 25 mg of Strattera at
that time, and a behavior modification approach was suggested.
Id.

### b.  June 2006 Psycho-Educational Evaluation

In the late spring of 2006, A.M. was referred to his
school's Committee on Special Education ("CSE") due to his
difficulty in processing auditory and visual information.  Id.
at 134.  As part of this process, Dr. Clark conducted a psycho-
educational evaluation.  Pl.'s Br. 8-9.  A Wechsler Intelligence
Scale for Children (Fourth Edition) Test ("WISC-IV") was
conducted, which revealed a full scale IQ of 71.  Admin. R. 135-
36.  According to the Developmental Test of Visual-Motor
Integration (Fifth Edition) ("VMI-V"), A.M.'s visual-motor
integration was within the low performance range.  Id. at 136.
His Test of Written Language showed that he had great
difficulty, and his contextual language score fell within the
borderline range.  Id.  On the ACTeRS Behavior Ratings Scale,
Dr. Clark noted that A.M. was almost never able to work
independently or persist with a task for a reasonable amount of

time.  Id. at 138.  She also noted that he struggled with making friends.  Id.

Based on these tests, Dr. Clark recommended that A.M. be considered a student with "Other Health Impairment" and be provided with classroom and testing accommodations.  Id. at 140. She also recommended that his caregivers at home be encouraged to provide home-based support on a daily basis.  Id.  She noted that his behavior did appear to be consistent with ADHD and that medical intervention had helped him manage his hyperactive and impulsive behavior, although the current medicine adjustment might have negatively impacted his ability to focus on everyday tasks.  Id.

### c.    June 2008 Youth Social History

In June 2008, Dr. Schuessler referred A.M. and Mace to Allen James Murray, a licensed clinical social worker with the Cerebral Palsy Association of the North Country.  Id. at 365-69. Murray recommended individual therapy with A.M. to help him cope with his ADHD and to improve his self-esteem.  Id. at 369.  He also recommended family therapy to ensure consistent parenting. Id.

### d.    August 2008 Psychological Evaluation

In August 2008, Dr. William Kimball ("Dr. Kimball") conducted an evaluation of A.M. based on interviews with A.M. and Mace, a mental status examination, and administration of the

WISC-IV.  Id. at 314-21.  A.M. was diagnosed with ADHD combined
type, disruptive behavior, borderline intelligence, and hand
tremors.  Id. at 321.  The doctor placed A.M.'s Global
Assessment Functioning ("GAF") score - a measure of mental
health - at 56 out of 100, indicating a condition of moderate
severity.  See id.

### e. September 2008 Childhood Disability Evaluation Form

J. Dambrocia ("Dr. Dambrocia"), a consulting psychologist
who examined A.M.'s record on behalf of the government,
evaluated A.M.'s functioning and found that although he had an
impairment or combination of impairments that were severe, it
did not meet or functionally equal the impairments listed in the
SSI guidelines.  See id. at 324.  The consultant was of the
opinion that the boy had "marked" limitations in "acquiring and
using information."  Id. at 326.  He had "less than marked"
limitations in "attending and completing tasks," "interacting
and relating with others," and "caring for himself."  Id. at
326-27.  A.M. had "no limitations" in "moving about and
manipulating objects" or with regard to his "health and physical
well-being."  Id.  The consultant recited A.M.'s history of ADHD
and ODD and noted that recent reports indicated that he had
difficulties with his behavior at home.  Id. at 329.

### f. March 2009 Occupational Therapy Evaluation

In March 2009, Elizabeth Ashley ("Ashley"), a certified occupational therapy assistant, evaluated A.M.'s progress and set future goals. Id. at 334-37. At this point, A.M. had been receiving occupational therapy twice a week. Id. at 334. Ashley noted that A.M. had made remarkable gains and attained most of the goals that had previously been set. Id. He had completed an exercise program at home, which had improved his arm stability and use, and his tremors had diminished, resulting in improved dexterity. Id. A.M.'s goals for 2009-2010 included learning to be more responsible and improving long-term memory, visual perceptual skills, and motor integration. Id. at 337.

### g.    June 2009 Psychological Re-evaluation

Dr. Clark evaluated A.M. again in June 2009. Id. at 338-45. She reported that his full scale IQ from the WISC-IV assessment had improved from 71 to 81, indicating a low average range of ability. Id. at 342. A.M.'s Perceptual Reasoning Index was found to be significantly low, which made it difficult for him to solve non-verbal problems. Id. at 343. His overall cognitive profile was found to be within the low average range, which was indicative of him having challenges with perceptual tasks and short-term auditory memory. Id.

### h.    March 2010 ADHD Questionnaire

Dr. Schuessler filled out a questionnaire in March 2010 regarding A.M.'s ADHD functioning. Id. at 347-52. At that

13

time, A.M. had been diagnosed with ADD, ODD, and a learning disorder.  Id. at 347.  Dr. Schuessler's answers were based on clinical evaluations and interventions over five years.  Id. at 349.  Dr. Schuessler found that A.M. suffered from marked impairments in social functioning and in maintaining concentration, persistence, and pace.  Id. at 351.  He also found that A.M. suffered from marked problems with inattention, impulsiveness, and hyperactivity.  Id. at 349-350.

### i.    June 2010 Occupational Therapy Evaluation

Ashley evaluated A.M. again in June 2010.  Id. at 353-54. At that time, Ashley recommended that he be discharged from occupational therapy because he had achieved all of his 2009-2010 goals.  Id. at 353.

### j.    June 2010 Psychiatric Evaluation

In June 2010, Dr. M. U. Saleem ("Dr. Saleem"), a psychiatrist, diagnosed A.M. with impulse control disorder in addition to ADHD and ODD.  Id. at 356.  He recommended that A.M. be admitted to the Community Health Center of North Country Psychiatric Services Clinic.  Id.  He started A.M. on 5 mg of Abilify in the morning in order to treat his agitation, aggression, impulse control problems, and mood swings.  Id.  He suggested that A.M. go through psychotherapy or counseling.  Id. at 357.

### k.    June-September 2010 Medications

Beginning in June 2010, A.M. received prescriptions for Strattera (25 mg), Concerta (27 mg), and Abilify (5 mg). Id. at 364. He renewed all these prescriptions on July 6, 2010 and again on August 3, 2010. Id. On August 31, 2010, Dr. Saleem discontinued the Abilify but renewed the other prescriptions. Id. Additionally, A.M. was also prescribed 1 mg of Risperdal and 25 mg of Benadryl. Id. at 363-64. Dr. Saleem discontinued the Benadryl on September 28, 2010 but continued the other medications. Id.

## II. LEGAL STANDARD

### A. Standard of Review

In general, the factual findings of the hearing officer "are conclusive unless they are not supported by substantial evidence." Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995) (citing 42 U.S.C. § 405(g)). To determine on appeal whether the hearing officer's findings are supported by substantial evidence, "a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). In this context, "substantial evidence" is evidence that amounts to "more than a mere scintilla," meaning that it is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." <u>Richardson</u> v. <u>Perales</u>, 402 U.S. 389, 401 (1971).
Where evidence is deemed susceptible to more than one rational
interpretation, the Commissioner's conclusion must be upheld.
<u>See</u> <u>Rutherford</u> v. <u>Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982).

 **B. Social Security Disability Standard**

  The Social Security Administration has prescribed a three-
step evaluation process that must be followed in determining
whether a child meets the statutory definition of disability.
20 C.F.R. § 416.924.  At the first step, the Commissioner is
required to make a determination of whether the child has
engaged in substantial gainful activity.  <u>Id.</u> § 416.924(b).  If
the Commissioner finds that the child has been engaged in
substantial gainful activity, then the child is not eligible for
SSI benefits.  <u>Id.</u>; 42 U.S.C. § 1382c(a)(3)(C)(ii).  If the
Commissioner does not find that the child has been engaged in
substantial gainful activity, then the evaluation process moves
onto the second step.

  The second step requires an examination as to whether the
child suffers from one or more medically determinable
impairments that, either singly or in combination, are properly
regarded as severe, meaning that they cause more than a "minimal
functional limitation."  20 C.F.R. § 416.924(c).  If it is
determined that a severe impairment exists, then the analysis
moves on to the final step, which involves a determination of

16

whether the impairment meets or equals a presumptively disabling condition identified in the listing of impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  For the purpose of this determination, equivalence to a listing can be either medical or functional.  20 C.F.R. § 416.924(d).  If the claimant is found to have an impairment that is medically or functionally equivalent to a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled; otherwise, the claimant will be deemed not disabled. Id.

## III. HEARING OFFICER'S DECISION

At the first step, the hearing officer made a finding that A.M. had not engaged in substantial gainful activity since April 3, 2008.  Admin. R. 17.  At the second stage, the hearing officer found that A.M. suffered from the following severe impairments: attention deficit hyperactivity disorder, oppositional defiant disorder, impulse control disorder, and borderline intellectual functioning.  Id.

At the third stage, the hearing officer first found that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 18.  In particular, she gave "great weight" to the opinion of Dr. Dambrocia because she found that it accorded with the objective medical evidence; she gave Dr. Schuessler's

opinion "little weight" because his conclusions appeared to be based less on objective evidence and more on Mace's subjective reports of A.M.'s behavior. See id. at 18-19. Next, the hearing officer found that A.M.'s impairments did not functionally equal the listed impairments. Id. at 20. Specifically, she based her conclusion on a finding that Mace's statements regarding A.M.'s limitations were not credible when compared to the objective evidence. See id. at 22. She also gave "great weight" to the opinions of Dr. Dambrocia, Dr. Kimball, and Dr. Saleem because of their consistency with the objective evidence, as well as to the opinions of several employees of A.M.'s school. See id. at 22-23. Dr. Schuessler's opinion was given little weight due to inconsistencies between it and the objective evidence in the record. Id. at 23.

## IV.  ANALYSIS

Mace offers three arguments that the hearing officer's decision was improper: (1) that A.M.'s impairments meet or medically equal a listed impairment, (2) that – in the event the first argument fails – A.M.'s impairments functionally equal one of the listed impairments, and (3) that the hearing officer did not weigh the evidence properly.  Pl.'s Br. 1.

### A.  Meeting a Listed Disorder

#### 1.  ADHD

In order to the satisfy the level of severity of the
listing for ADHD as required in an application for SSI benefits
for a child, there must be (1) medically documented findings of
marked inattention, marked impulsiveness, and marked
hyperactivity, (2) resulting in a marked impairment in at least
two of the following: cognitive/communicative function, social
functioning, personal functioning, or maintaining concentration,
persistence and pace.  20 C.F.R. Pt. 404, Subpt. P, App. 1,
Listing 112.11; see also Brown v. Comm'r of Soc. Sec., 430 F.
Supp. 2d 102, 104 (W.D.N.Y. 2005).

In the present case, A.M.'s treating physician, Dr.
Schuessler, provided a report dated March 16, 2010, wherein he
determined that A.M. met Listing 112.11 with marked limitations
in multiple areas.  Admin. R. 19.  The hearing officer, however,
gave Dr. Schuessler's opinion "little weight" on the grounds
that it was not supported by the medical evidence (including his
own clinical findings) and that it appeared to be based on
Mace's subjective statements designed to obtain benefits for
A.M.  Id.

Mace argues that the hearing officer erred in
characterizing the treating physician's opinion as inconsistent
with other substantial evidence.  Pl.'s Br. 19-20.  The Second
Circuit has held that the following factors ought be considered
when the treating physician's opinion is not given controlling

weight: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)). Additionally, the hearing officer should always give good reasons regarding her determination of weight accorded to the treating physician's opinion. Id. at 503-04. Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. Id.

In this case, the hearing officer substantiated her conclusion by referring to Dr. Schuessler's own previous reports. Admin. R. 19. In particular, she referred to Dr. Schuessler's reports dated March 28, 2008 and December 18, 2009, where he found A.M. to be alert and cooperative, sitting quietly through forty to ninety minutes with family. Id. (citing id. at 307, 346). More broadly, she cited Dr. Schuessler's findings that A.M. had less than marked limitations in a variety of the functions described in Listing 112.11 as critical for a finding of disability. Id. (citing id. at 296-311). The hearing officer also referred to a psychiatric evaluation report by Dr. Saleem dated June 22, 2010 wherein A.M.'s attention and

concentration were found to be "fair," his speech found to be "underproductive but coherent," and his fund of information and knowledge were found to be "average." Id. 355-356.

In Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009), the Second Circuit held that the hearing officer did not err in declining to give controlling weight to the treating physician's opinion in a check-off form where the opinion was contradicted by the findings of every other physician on record and the finding was not corroborated with laboratory findings or accompanied by an explanation. The opinion of the treating physician is deemed controlling only if it is well-supported by clinical evidence. Schaal, 134 F.3d at 503. In the present case, the ADHD questionnaire filled out by the treating physician appears to be contrary to the weight of other evidence in the record (as has been discussed above). Thus, considering that the hearing officer has given valid reasons for not considering the treating physician's reports as controlling, this Court rules that Mace has not adequately demonstrated that the hearing officer erred by finding that A.M.'s ADHD did not meet Listing 112.11.

## 2. Intellectual Disability

Listing 112.05, dealing with intellectual disability, is met when a claimant's mental condition is characterized by significantly sub-average general intellectual functioning with

deficits in adaptive functioning; a claimant may meet this
standard by fulfilling one of six different severity
requirements.  20 C.F.R. Pt. 404, Subpt. P, App. 1 Listing
112.05.

The hearing officer held that A.M. did not meet any of the
relevant severity requirements under this listing.  As
contemplated by Listing 112.05B, the record failed to establish
that his impairments left him dependent on others to meet his
personal needs.  Admin. R. 19.  Additionally, A.M.'s prior IQ
scores did not meet the level of severity required for Part C,
which requires a verbal, performance, or full scale IQ of 59 or
less.  Id.; see also id. at 341 (noting that A.M. had a full
scale IQ of 71).  Turning to part D, which covers children with
intelligence scores between 60 and 70 along with other physical
or mental limitations of function, the hearing officer found
that although A.M. had obtained a verbal performance score of
69, his higher scores in other areas and his doctors' suspicion
that this score was due more to attention span problems than a
lack of intelligence meant that this part of the listing was not
satisfied.  Id. at 19-20.  She also cited the fact that none of
A.M.'s treating or examining sources had formally diagnosed him
with mental retardation, as they had instead diagnosed him with
"borderline intellectual functioning."  Id. at 19.  Finally, the
hearing officer found that A.M. did not have two or more of the

appropriate age-group criteria in paragraph B2 of 112.02, as is necessary to meet Listings 112.05A, 112.05E, and 112.05F.  Id.

Arguing that A.M. falls within the ambit of Listing 112.05D, Mace notes that the plain language of the listing does not require a diagnosis of mental retardation, but only that the lowest of the child's valid verbal, performance, and full scale IQ scores fall between 60 and 70.  Pl.'s Br. 20.  He claims that the hearing officer added an additional requirement onto the law by requiring a specific diagnosis of mental retardation.  Id. at 21.  In relevant part, Listing 112.05D requires that a claimant have a valid verbal, performance, or full scale IQ between 60 and 70 and a physical or other mental impairment imposing an additional or significant limitation of function.  20 C.F.R. Pt. 404, Subpt. P, App. 1 Listing 112.05D.  Mace claims that the first part of this requirement is met because A.M. received a perceptual reasoning score of 69 during his August 23, 2008 session with Dr. Kimball; he further claims that the hearing officer's finding that A.M. suffered from other severe impairments (such as ADHD and ODD) means that the second part of Listing 112.05D is satisfied as well.  Pl.'s Br. 21 (citing Admin. R. 318).

In the present case, the hearing officer went into great detail while discussing Listing 112.05D.  She noted that although A.M. had "severe" limitations in certain aspects, these

23

were not sufficient to cause him to have additional or significant limitations.  See Admin. R. 19 (stating that although A.M. sometimes needed reminders, he was able to dress, bathe, groom, feed, use the toilet, and perform household chores independently).  The hearing officer also engaged in a detailed explanation of the various tests undergone by A.M., and the functional limitations (or lack thereof) that result.  See id. at 19-20.  Accordingly, this Court holds that the decision of the hearing officer that A.M. does not meet Listing 112.05 is supported by substantial evidence.

## B.   Functionally Equaling a Listed Disorder

In the event that the Court upholds the hearing officer's finding that A.M. did not meet or medically equal a listing, Mace also argues that the hearing officer erred in making a finding that A.M. did not functionally equal a listed impairment.  Pl.'s Br. 21.  A child functionally equals a listed impairment if he or she has an "extreme" impairment in one of six specified areas of functioning or a "marked" impairment in two of the six areas of functioning.  See 20 C.F.R. § 416.926a(a), (b)(1)(i)-(vi).  In the present case, the hearing officer found A.M. to have a marked limitation in acquiring and using information.  Admin. R. 24.  She found A.M. to have "less than marked limitation" in "attending and completing tasks," in "interacting and relating with others," and in the domain of

"health and physical well-being." Id. at 27-28, 33. She also found A.M. to have "no limitation" in "moving about and manipulating objects" and in the "ability to care for himself." Id. at 30-32. Mace disputes the hearing officer's decision with respect to two of the six areas of functioning. Pl.'s Br. 23.

### 1.    Limitation in Attending and Completing Tasks

In this domain, the hearing officer is required to consider how well the child is able to focus and maintain his attention and how well he begins, carries through, and completes his activities. 20 C.F.R. § 416.926a(h). The hearing officer is also required to consider the pace at which the child performs his activities and the ease with which he changes them. Id. School-age children - the age bracket that included A.M. at the time of his application for benefits - should be able to change routines without distraction, stay on task when appropriate, and be able to complete a transition task without extra reminders and accommodation. Id. § 416.926a(h)(2)(iv).

Mace argues that in finding that A.M. had less than marked limitations in this domain, the hearing officer ignored substantial evidence establishing a marked limitation. Pl.'s Br. 23. Specifically, he claims that the hearing officer incorrectly weighed the evidence in that she failed to consider the effect of A.M.'s medication and structured settings in determining the nature of his limitation in this area. Id. at

24. In addition to his ADHD medication, A.M. received extended time and a low-distraction location in which to take tests. Id. at 23. He was also instructed in small groups to reduce distractions and was redirected as needed. Id. at 23-24. In 2009-2010, A.M. was placed in a resource room in addition to receiving consultant teacher services. Id. at 24. Mace contends that the hearing officer's failure to consider these accommodations is legal error and the decision should be reversed. Id.

In her report, the hearing officer recorded that A.M. received continued accommodations, including taking tests in a quiet location to minimize distractions and help him focus. Admin. R. 27. She also noted that A.M. was having difficulty working in large group sessions, but worked well with one-on-one instruction or a smaller group setting to help redirect him to task. Id.

In Archer ex rel. J.J.P. v. Astrue, 910 F. Supp. 2d 411, 427 (N.D.N.Y. 2012), the court held that although the hearing officer was under no obligation to make explicit reference to the presence of a supportive or structured setting, his decision denying benefits was insupportable because he failed to demonstrate that he had considered what limitations the claimant would have in the absence of such a structured setting. See also Watson ex. rel. K.L.W. v. Astrue, No. 07-CVi6417T, 2008 WL

3200240, at *5 (W.D.N.Y. Aug. 5, 2008) (holding that while the hearing officer must consider the claimant's need for a structured setting and how he functions without such a setting, the relevant regulation does not command the hearing officer explicitly to discuss this consideration).

This, however, is not the case here. First, here the hearing officer made explicit reference to the continued accommodations being provided to A.M., and second, she reconciled the accommodation requirement with other sources of information to make her finding. See Admin. R. 27 (making reference to progress reports from the school stating that the A.M. had generally satisfactory scores in following directions, remaining attentive, and organizing materials and Mace's testimony that A.M. could perform certain activities on a daily basis at home with periodic reminders or assistance). This Court thus holds that the hearing officer adequately considered A.M.'s need for accommodations and did not err in finding that A.M. did not have a marked limitation in attending and completing tasks.

## 2. Limitation in Interacting and Relating with Others

In determining whether a child is impaired in the domain of "interacting and relating with others," the hearing officer is required to consider how well the child initiates and sustains emotional connections with others, develops and uses language,

complies with rules, responds to criticism, and respects and takes care of the possession of others. 20 C.F.R. § 416.926a(i). School-age children should be able to develop lasting friendships with others of the same age, develop an increasing ability to understand another's point of view, and tolerate differences. Id. § 416.926a(i)(2)(iv).

Mace contends that despite medical intervention and behavior modification, A.M. has continued to act out aggressively and is oppositional when he is not in his structured school setting. Pl.'s Br. 25. Mace argues that the hearing officer applied an erroneous legal standard because she failed to take into account the effects of treatment and a structured setting in finding that A.M.'s limitations in this domain were less than marked. Id.

An examination of the hearing officer's findings reveals that she referred to multiple reports from A.M.'s teachers observing that his behavior was age appropriate (albeit comparatively immature as compared to his peers). Admin. R. 29. Mace's present allegations about A.M.'s aggressive and oppositional behavior outside the school setting, Pl.'s Br. 25, appear to be in tension with his testimony at the hearing, where he stated that although A.M. did have trouble making friends because he mostly kept to himself, he did have some friends. Admin. R. 45. Mace also testified at the hearing that A.M. did

not have any problems with the teachers at school, nor with kids on the bus.  Id. at 45-46.

The hearing officer specifically referred to a report dated June 22, 2010 wherein Mace stated that A.M. had choked his sister and hit and kicked other people.  Id. at 29 (citing id. at 370).  During the hearing, however, Mace testified before the hearing officer that A.M. had not become violent towards his siblings.  Id.  With regard to his behavior at home, Mace further testified that since A.M. started undergoing counseling and taking medication, he was not having as many outbursts as before.  Id.  The hearing officer also referred to Dr. Kimball's mental status examination, where A.M. reported that he can get into arguments and be bossy with friends but spoke positively about playing with other children and his friend Ryan.  Id. at 29.  A.M. also spoke positively about his father's fiancée, her parents, and his mother's boyfriend.  Id.  The hearing officer acknowledged that A.M. had never needed the use of a behavior modification plan at school, and that there were concerns that his poor behavior at home was caused by inconsistent parenting following his parents' divorce.  Id.

Mace argues only that the hearing officer erred in failing to take into account A.M.'s functioning outside the supportive setting at school.  Pl.'s Br. 25.  As stated in Archer, 910 F. Supp. 2d at 427, the failure of the hearing officer to make

explicit reference to the accommodations provided to a child constitutes legal error only if it appears that the hearing officer has completely failed to consider those accommodations in making her findings. This is not so in the present case. Here, the hearing officer clearly has referred to the supportive settings provided to the child and has also reconciled the weight of evidence with the accommodations. This Court holds that the hearing officer's decision in finding that A.M. does not have a marked limitation in interacting and relating with others is supported by substantial evidence.

### C.  Weighing of the Evidence

Mace argues that the hearing officer erred by failing to discuss the opinion of school psychologist Ms. Clark with respect to A.M.'s functioning. Pl.'s Br. 22-23. This contention is factually incorrect – the hearing officer does refer to the scores obtained by A.M. in the WISC-IV test conducted by Dr. Clark both in 2006 and later in 2009. Admin. R. 19. The hearing officer further acknowledged that both the consultative psychologist and Dr. Clark had opined that A.M. was functioning within the "low average" or "borderline" range. Id. The hearing officer also considered the concerns that these scores were not an accurate estimate of A.M.'s functioning, and that appropriate medical treatment for his ADHD could possibly result in higher IQ scores. Id.

Secondly, Mace argues that it was error for the hearing officer to assign "great weight" to the opinion of Dr. Dambrocia, the non-examining review consultant. Pl.'s Br. 23. Mace argues that there was a contradiction between the opinion of the treating physician and the reviewing examiner and that such a situation requires the hearing officer to develop the record further. Id. (citing F.S. v. Astrue, No. 1:10-CV-444 (MAD), 2012 WL 514944, at *8 (N.D.N.Y. Feb. 15, 2012) (D'Agostino, J.)).

In Santos v. Barnhart, No. 04 CV 2050 (JG), 2005 WL 119359, at *8 (E.D.N.Y. Jan. 7, 2005), the court held that the hearing officer had failed to develop the record when he failed to obtain evaluations from a treating physician with a long-term relationship with the claimant for an assessment of the claimant's impairments and their impact on the relevant six domains. See also McClain v. Apfel, No. 99 Civ. 3236 VM JCF, 2001 WL 66403, at *10 (S.D.N.Y. Jan. 26, 2001) (finding that hearing officer had failed to develop the record when he merely conducted perfunctory hearings, failed to obtain updated school records, and relied on forms with scant information or on outdated educational reports; also discussing the fact that the hearing officer relied heavily on records documenting claimant's development until the age of four, but did not issue his opinion until the claimant was almost eight years old).

31

In the present case, Dr. Dambrocia, the non-examining review consultant, submitted his report in September 2008. Admin. R. 324-325. The hearing officer obtained educational records updated until October 2010, office treatment records updated until September 2010 from Dr. Saleem, office treatment records from Dr. Schuessler updated until March 2010, and physical/occupational therapy records dated September 2010. See Admin. R. The hearing was held on October 14, 2010, and the decision was issued on December 3, 2010. Admin. R. 34, 40. The hearing officer thus obtained records updated to within two months of the hearing date. The Court also notes that the hearing officer provided A.M. with an additional two weeks to submit updated progress treatment notes from A.M.'s psychiatrist. Admin. R. 42-43. Additionally, in the present case, unlike in McClain, the hearing officer conducted a thorough hearing wherein he heard testimony from both Mace and A.M. Id. at 44. This Court thus finds that the hearing officer has not failed adequately to develop the record.

In reviewing a hearing officer's decision under the "substantial evidence" standard this Court is permitted to reject the hearing officer's findings only if no reasonable factfinder could agree with the hearing officer's decision. Brault v. Social Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012). Given this highly deferential standard of review, this

Court has the freedom to take a case-specific and comprehensive view of the administrative proceedings, and to weigh all the evidence to determine if it meets the "substantial evidence" standard. In the present case, and upon a complete consideration of all the evidence, this Court is of opinion that a reasonable factfinder would not have concluded differently from the hearing officer. Accordingly, this Court affirms the hearing officer's findings.

## V.    CONCLUSION

Wherefore, for the foregoing reasons it is hereby ORDERED that Mace's motion for judgment, ECF No. 11, is DENIED, and that the Commissioner's motion for judgment, ECF No. 12, is GRANTED.

**SO ORDERED.**

_/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE
